UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    LARRY W. WELLS                                CASE NO. 06-30345

                          Debtor                      Chapter 7
--------------------------------------------------------
LARRY W. WELLS

                          Plaintiff

          vs.                               ADV. PRO. NO. 06-80207

SALLIE MAE

                          Defendant
--------------------------------------------------------
APPEARANCES:

ABRAMS & AGNELLINO                        ARTHUR D. AGNELLINO, ESQ.
Attorneys for Plaintiff/Debtor                Of Counsel
515 South Main Street
Athens, PA 18810

WHITEMAN OSTERMAN & HANNA LLP     WILLIAM S. NOLAN, ESQ.
Attorneys for Defendant/Sallie Mae         Of Counsel
One Commerce Plaza
Albany, New York 12260


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


      Before this Court is an adversary proceeding commenced on July 6, 2006, by Larry W. Wells ("Debtor") by the filing of a complaint against Educational Credit Management Corporation ("ECMC"), as assignee of New York State Higher Education Services Corporation

and/or Sallie Mae,[1] seeking a discharge of student loans made to the Debtor pursuant to § 523(a)(8) of the Bankruptcy Code, 11 U.S.C. §§101-1532 ("Code").  Issue was joined by the filing of an answer on behalf of ECMC on July 19, 2006.  On November 2, 2006, the Debtor filed an Amended Complaint to which an Answer was filed on behalf of ECMC on November 6, 2006.

A trial was held in Utica, New York, on July 16, 2007.[2]  Following the trial, the Court reserved its decision and granted both parties the opportunity to file memoranda of law in lieu of closing arguments.  The matter was taken under submission on August 13, 2007.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1134(b), 157(a), (b)(1), and (b)(2)(I).

## FACTS

The Debtor filed a voluntary petition ("Petition") seeking relief pursuant to chapter 7 of

---

[1] Although Sallie Mae Servicing Corp. was named as the defendant, it was ECMC which appeared before the Court at the trial.  *See* ECMC's Exhibit D (Assignment of Claim of New York State Higher Education to ECMC, dated August 8, 2006).

[2] The Debtor's chapter 7 case is filed in the Syracuse Division of the U.S. Bankruptcy Court of the Northern District of New York.  However, on April 12, 2007, the Hon. Margaret Cangilos-Ruiz, U.S. Bankruptcy Judge, signed an Order recusing herself from presiding over the adversary proceeding in the Debtor's case pursuant to 28 U.S.C. § 455(b)(2) based on her prior association as an attorney in the firm of Whiteman Osterman & Hanna LLP, which represents ECMC in this proceeding.

the Code on October 7, 2005. In his schedules, the Debtor lists an obligation to Sallie Mae in the amount of $73,749. *See* Schedule F, attached to Debtor's Exhibit 3. As of July 1, 2007, the balance on the student loans amounted to $80,827.70. *See* ECMC's Exhibit M at ¶ 13.

At the time of the trial, Debtor was fifty-three years of age and married to Penny Wells.[3] The Debtor testified that in 1999 he borrowed $10,000 from Sallie Mae to finance his son's college education at the State University of New York at Alfred.[4] According to the Debtor, because his son was living with his parents, he was not eligible for an independent student loan. A second loan in the amount of $2,000 was made to the Debtor to cover the costs of a computer for his son. According to the Debtor, he began making payments on what he assumed was a consolidated loan of $12,000. He later discovered that the payments had been applied only to the $2,000 loan and that the $10,000 had been deferred.

The Debtor testified that after one year at the State University of New York at Alfred, his son transferred to Rochester Institute of Technology, and the Debtor borrowed additional monies on his son's behalf. According to the Debtor, he was making payments on both the $2,000 loan

---

[3] The Debtor testified that his wife had filed a chapter 7 petition in 2004. A review of the docket in that case (04-69018) indicates that she filed on December 29, 2004, and was granted a discharge on April 13, 2005. In her schedules, she listed a total of $70,931.96 in unsecured debt, including $38,785.41 owed to Sallie Mae in connection with a student loan obtained in September 1987. The docket in that case indicates that no adversary proceeding was commenced seeking a discharge of the loan.

[4] In the parties' Trial Stipulation, it is stated that the Debtor's son attended the State University of New York at Alfred. *See* ECMC's Exhibit M at ¶ 9. However, at the trial, as well as in the Debtor's Post-Trial Memorandum of Law, filed on August 9, 2007 (Docket No. 28), reference is made to "Alford University." A search of the internet indicates that both institutions of higher education exist in New York State; however, because the identification of the correct university is not a material fact, the Court will simply incorporate the term used in the Trial Stipulation.

4

and the latter loan. At the time, he was working for Anchor Glass Container Corporation ("Anchor Glass") as a forklift operator, and his wife was working at Bob's Honda as a title clerk/secretary.[5] In answer to interrogatories, the Debtor indicated that he made payments on the loans between January 19, 2001 and February 27, 2004. *See* ECMC's Exhibit J, Response to Interrogatory No. 13.

According to his wife's testimony, at the time that the original loan was taken out, she had been working for the U.S. Postal Service and as a substitute teacher. She testified that she had obtained a bachelor's degree in elementary education in 1992 at the age of 32 but that her teaching certification had lapsed in 2003. According to her testimony, she had applied for a job as a postmaster and is also on a list for a clerk's position should one become available at the local post office. She had also applied for a position with Head Start and with the local school district to be a teacher. She testified that she had also applied to be a teacher in school districts located in Tennessee and Georgia where she has relatives. Currently, she works less than 10 hours per week as a relief postmaster. She is guaranteed only four hours per week. She also works for Liberty Research, Inc. doing cleaning at a couple of local offices for approximately 5-13 hours every two weeks.

According to their Federal tax returns for 2003 and 2004, their combined gross income totaled $52,384 and $57,204, respectively. *See* Debtor's Exhibits 4 and 5. In December 2004 the Debtor's spouse lost her full-time job at Bob's Honda. On or about December 8, 2004, the Debtor signed a Federal Consolidation Loan Application and Promissory Note. *See* Debtor's

---

[5] In her petition filed in December 2004, she indicated that she had been employed by Bob's Cycle Shop in Sayre, Pennsylvania, for three years.

Exhibit 1. At the time of consolidation, the amount financed totaled $51,818.10, including unpaid principal and capitalized interest. *See* Debtor's Exhibit 2. The Debtor explained that in December 2004 he was forced to give up the swing shift at Anchor Glass because he had been having problems falling asleep while driving to and from work. This resulted in an annual decrease in his income of $7,000. Then in March 2005 the Debtor ruptured a blood vessel in his spinal cord while at work, which left him temporarily paralyzed. Although his payments were to have begun on March 22, 2005 on the consolidated loan, in response to Interrogatory No. 2, the Debtor indicated that he made a telephone request and was granted a year's forbearance. *See* ECMC's Exhibit J. However, according to the Debtor, he had no paperwork to substantiate the forbearance. *Id.* On cross-examination he acknowledged that he had made no payments on the consolidated loan whatsoever despite having been granted the alleged deferment.

According to the Debtor, although he was to have been out of work for a year, he opted to return in September 2005 after only six months because Anchor Glass had filed for bankruptcy relief and there were rumors that the company was going to be sold. In November 2005 he fell and broke his ankle and was out of work until January 2006. He testified that he still experiences some weakness in one of his legs and is unable to sit for any length of time. He alleges that he is also blind in one eye.

According to their Federal tax returns for 2005 and 2006, their combined gross income totaled $30,241 and $37,871, respectively. *See* Debtor's Exhibits 6 and 7. In addition, the Debtor received $4,653 in unemployment compensation in 2005. *See* Debtor's Exhibit 6. Debtor's weekly gross income is $753.04 and net income is $544.55 after deductions, including union dues, 401k contribution and insurance premiums. *See* Debtor's Exhibit 10. He testified that he

6

is unable to request overtime, but that in some instances it does become available and is assigned based on seniority. When asked on cross-examination about seeking other employment, the Debtor responded that his health prevented him from working a second job. He also testified that he had not sought out other positions with his current employer. According to a recent payment advice, as of June 29, 2007, Debtor's wife's gross earnings were $3,378.48 for the first seven months of 2007 working for the U.S. Postal Service. She also earned $182 in March 2007 cleaning for Liberty Research, Inc. *See* Debtor's Exhibit 11.

In October 2005 when the Debtor filed his chapter 7 petition, he identified $2,343.69 in monthly household expenses. According to a computer printout generated by the Debtor, his expenses for the month of June 2007 totaled $1,921.19. *See* Debtor's Exhibit 12. The Debtor testified that owns an 1800 square foot, three bedroom manufactured home, which is seven years old. There is mortgage on the property of approximately $69,000. The monthly mortgage payments are $556.78. *Id.* He also pays approximately $2,800 annually in county and school taxes. He also testified that he had borrowed money from his sister to pay the taxes, later using his vacation pay to repay her. He also borrowed money from his brother to pay last year's heating bill.[6]

On cross-examination, the Debtor testified that he believed that it would cost more to rent even a one bedroom apartment in the local area than what he was paying to maintain his house. He based his belief on the fact that his daughter was renting a three bedroom apartment in the area for over $500 per month. However, he acknowledged that he had not actively looked to rent an

---

[6] According to the Debtor's responses to interrogatories, he borrowed $1,067.87 from his brother in October 2006 to pay for fuel oil, and he borrowed $700 from his sister in October 2006, which he used to pay a portion of his school taxes. *See* ECMC's Exhibit J.

apartment with the intent of lowering his housing costs.

According to the Debtor's Schedule J, in October 2005 he was paying $245 per month in automobile insurance. At trial he testified that his current monthly payments were approximately $129 per month on a 1981 Plymouth Acclaim, which is not running; a 1998 Dodge Dakota pickup, and a 2001 Pontiac Sunfire, driven by his wife. He estimated that with the price of gasoline, he is spending over $200 a month traveling to and from work.

He estimated that he paid between $105 and $120 per month for his cell phone. He explained that because they lived out in a rural area and drove less than reliable cars, it was important that he and his wife be able to communicate with one another in case of a breakdown. He testified that he also had a home telephone line, which was needed for access to high speed internet. His monthly bill for this telephone, as well as DirectTV and the internet was $135 per month. He testified that he used the internet to pay many of his bills online. On cross-examination the Debtor also acknowledged occasionally dining out at a monthly cost of no more than $30 per month. He also testified that he enjoys golfing and tries to play 3-4 times over the summer if he is able to afford it. He purchases his clothes from the Salvation Army and no longer eats "some of the good stuff they used to."

In addition to reaffirming the mortgage obligation in the amount of $70,075.75, the Debtor reaffirmed a monthly obligation of $277.16 over 28 months on the 2001 Pontiac Sunfire, the latter having been financed with Ingersoll Rand Federal Credit Union. *See* Debtor's Exhibit 9. He testified that he had reaffirmed a credit card account debt of approximately $1,800 also owed to the Ingersoll Rand Federal Credit Union.

By letter dated April 9, 2007, ECMC's attorney notified Debtor's counsel that the Debtor

8

was eligible to participate in the William D. Ford Direct Loan repayment program. *See* ECMC's Exhibit L. According to the letter, the balance on the consolidated loan amounted to $79,000. Based on gross household income of $39,278, as reported on the Debtor's 2006 Federal tax return, the Debtor was informed that he could pay $809.26 per month for 120 months, or $434.63 per month for 180 months, or $404.63 per month for 360 months. The Debtor testified that he believed that he would be unable to afford any of the proposed options.

## DISCUSSION

In 1987 the U.S. Court of Appeals for the Second Circuit established a three-prong test for a debtor seeking an undue hardship discharge under Code § 523(a)(8). *See Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987). This test has found favor in a number of other circuits. *See, e.g., In re Faish*, 72 F.3d 298 (3d Cir. 1995); *In re Frushour*, 433 F.3d 393 (4th Cir. 2005); *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003); *In re Tirch*, 409 F.3d 677 (6th Cir. 2005); *In re Goulet*, 284 F.3d 773 (7th Cir. 2002); *In re Rifino*, 245 F.3d 1083 (9th Cir. 2001); *In re Alderete*, 412 F.3d 1200 (10th Cir. 2005); *In re Cox*, 338 F.3d 1238 (11th Cir. 2003).[7] The Debtor has the burden of proving by a preponderance of the evidence

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans."

---

[7] The Eighth Circuit has adopted a totality of circumstances test in determining undue hardship. *See, e.g., In re Reynolds,* 425 F.3d 526, 532 (8th Cir. 2005), citing with approval, *In re Andrews*, 661 F.2d 702, 704 (8th Cir. 1981).

*Brunner,* 831 F.2d at 396. Furthermore, all prongs of the three-prong "undue hardship" test must be met in order for the debt to be discharged. *See id.; In re Davis*, Case No. 06-CV-0208, 2007 WL 2088942, *2 (W.D.N.Y. July 19, 2007); *In re Fabrizio*, 369 B.R. 238, 244 (Bankr. W.D. Pa. 2007). If a debtor fails to prove one of the *Brunner* elements, the debtor's educational loans cannot be discharged. *See id.; In re Wetzel*, 213 B.R. 220, 225 (Bankr. N.D.N.Y. 1996).

The Debtor's counsel argues that this approach is not applicable in the situation where a parent has taken out the loan on behalf of his/her child and that a totality of circumstances test should be applied instead. According to Debtor's counsel, he was "unable in his research to find a similar case, of this nature, but suggests that a more equitable approach be devised by this [C]ourt because of the unique situation that this case presents." Post-Trial Memorandum of Law, filed August 9, 2007 (Docket No. 28).

Contrary to the assertion by Debtor's counsel, the Court has reviewed a number of cases that have considered the issue. *See, e.g., In re Norris*, 239 B.R. 247, 251 (M.D. Ala. 1999) (noting that the majority of courts have concluded that Code § 523(a)(8) "excepts from discharge a guaranteed education loan debt even if the debtor is not the beneficiary of the loan"); *In re Hamblin*, 277 B.R. 676, 679 (Bankr. S.D. Miss. 2002) (indicating that the majority of courts have concluded that "student loans obtained by a parent for the educational benefit of a child are non-dischargeable" and listing over a dozen cases that have considered the issue); *In re Clark*, 273 B.R. 207, 210 (Bankr. N.D. Iowa 2002) (agreeing with the "significant number of cases" that hold that Code § 523(a)(8) applies to "an educational loan made to the parent of a student when the parent is the sole obligor on the note").

Admittedly, there is language in the legislative history of the statute that indicates that in

enacting the statute, Congress recognized that

> educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and relying for repayment solely on the debtor's future increased income resulting from the education. In this sense, the loan is viewed as a mortgage on the debtor's future.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6094. Indeed, there are a few courts that have relied on this history in taking the position that in enacting Code § 523(a)(8), Congress intended that it only apply to student borrowers, and it did not contemplate expanding the statute's coverage to non-student borrowers and co-makers. *See, e.g., In re Bawden*, 55 B.R. 459 (Bankr. M.D. Ala. 1985).

The fallacy of that approach is that if the plain meaning of the statute is clear, reliance on its legislative history is neither necessary nor proper. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1988) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) for the premise that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"); *see also Caminetti v. United States*, 242 U.S. 470, 485 (1917) (stating that "the meaning a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms"). Code § 523(a)(8) makes no distinction between an individual debtor's status as a borrower, whether he/she be student, spouse of a student or parent of a student. It merely states that a discharge under Code § 727 does not discharge an individual debtor from any debt for loans "made, insured, or guaranteed by a governmental unit, or made under any program funded in

11

whole or in part by a governmental unit or nonprofit institution . . . ." 11 U.S.C. § 523(a)(8).[8] The language is unambiguous. *Hamblin,* 277 B.R. at 681-82; *In Palmer*, 153 B.R. 888, 895 (Bankr. D.S.D. 1993). The focus of Code § 523(a)(8) is on the type of debt, rather than the type of "debtor." *Id.*

Even if the Court were to find it necessary to consider the statute's legislative history, it is evident that its purpose is not only to prevent undeserving student borrowers from abusing the loan programs but also to preserve the financial integrity of the loan system by assuring the availability of monies to students in the future. *Norris*, 239 B.R. at 253; *Hamblin*, 277 B.R. at 682. As noted by one court, "[a] loan program is affected just as much when a parent discharges a loan as when a student discharges a loan." *In re Garelli*, 162 B.R. 552, 555 (Bankr. D.Or. 1994). Thus, this Court concludes that Code § 523(a)(8) is applicable to the loans obtained by the Debtor in connection with his son's education. Furthermore, the Court cannot agree with the suggestion of the Debtor's attorney that it consider the totality of the circumstances rather than the factors set forth by the U.S. Court of Appeals for the Second Circuit in *Brunner*. The Court is bound by the approach taken in *Brunner. See Faish*, 72 F.3d at 306 (noting that "[e]quitable concerns or other extraneous factors not contemplated by the *Brunner* framework may not be imported into the court's analysis to support a finding of dischargeability"). Accordingly, the Court will examine the three factors set forth in *Brunner*.

---

[8] Because the Debtor's petition was filed on October 7, 2005, the language of Code § 523(a)(8), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, made applicable to cases filed after October 16, 2005, is not relevant to the matter herein.

Minimum and Maximum Analysis

The first prong of the *Brunner* test requires the Court to examine whether the Debtor has demonstrated, based on his current income and expenses, that he cannot maintain a minimal standard of living for his family and repay the educational loans. *See Brunner*, 831 F.2d at 396. Total household income, including that of a non-debtor spouse, must be considered when addressing the first prong of *Brunner. See Davis,* 2007 WL 2088942, at *5; *Gizzi v. Educational Credit Mgmt. Corp.*, 364 B.R. 250, 254 (N.D.W.Va. 2007); *In re Geyer*, 344 B.R. 129, 132 n.1 (S.D. Cal. 2006). The debtor "must demonstrate more than simply tight finances; the proper inquiry is whether it is unconscionable to require debtor to earn more income or reduce expenses" in order to repay the loans. *Shank v. American Educ. Servs./SLFC-LAW*(*In re Shank)*, Case No. 05-3655, 2006 WL 2374869, at *1 (D. Ariz. Aug. 15, 2006) (citation omitted).

In 2006 the Debtor and his wife earned a combined gross income of $37,871.[9] According to the Debtor's schedules, at the time he filed his Petition in October 2005, their household expenses totaled $28,124.28. These expenses included $45 for telephone. However, according to the schedule of expenses for February - June 2007, the Debtor and his wife are now spending between $105 and $140 for cell phone services with Verizon. *See* Debtor's Exhibit 12. They are also spending $145 per month for DirectTV, telephone and internet services. *Id.* It does appear that the Debtor has been able to reduce his automobile insurance from $245 in October 2005 to $129 per month at the time of trial. The Debtor and his wife occupy a three bedroom home on

---

[9] The Court takes judicial notice that the 2007 poverty guideline for a family of two is $13,690 as updated each year by the Census Bureau and issued in the *Federal Register*, Vol. 72, No. 15, Jan. 24, 2007, pp. 3147-48, by the Department of Health and Human Services. . *See* http://aspe.hhs.gov/poverty/07poverty.shtml

13

2.7 acres of land. The expenses associated with home ownership total in excess of $850 per month, including taxes and insurance, as well as the monthly mortgage payment. The Debtor testified that they had not considered renting an apartment in order to minimize their expenses. It was his opinion that renting an apartment would be just as costly.

The Court believes that even if the Debtor was to rebudget and adjust his current expenses as suggested by ECMC, including reduction in their cell phone expenses and a change from home ownership, the Court does not believe that their current income would be adequate to fully amortize the entire amount of their student loan debt over the next fifteen years[10] at the rate of $434.63 per month under the William D. Ford Direct Loan repayment program as proposed by ECMC. Accordingly, the Court finds that the Debtor has satisfied the first prong of *Brunner*.

Duration of Inability to Repay Loans

The second prong of the *Brunn*er test, however, requires that the Debtor prove more than his present inability to pay his student loan obligations. He must also establish that his current financial hardship is likely to be long-term. *In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981) (indicating that the dischargeability of student loans is "based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."). As this Court previously noted, "[m]ere inconvenience, austere budget, financial difficulty and inadequate present employment are not grounds for discharging educational debts under Code § 523(a)(8)." *Wetzel*, 213 B.R. at 225.

What is important for the Court to consider is whether there are "unique" and

---

[10] In fifteen years, the Debtor will be 68 years old and his wife will be 62 years old.

"exceptional" circumstances, beyond the reasonable control of the Debtor, that would prevent future employment and the ability to repay the debt. He must demonstrate to the Court that his current financial hardship is likely to be long-term. *Brunner*, 831 F.2d at 396 (indicating that the evidence must establish "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time ..."); *Davis*, 2007 WL 2088942 at *6 (stating that "[o]nly a debtor with rare circumstances will satisfy this factor"); *In re Garrett*, 180 B.R. 358, 363 (Bankr. D.N.H. 1995) (citations omitted) (stating that the "inability to pay which can constitute undue hardship must be long-term and not simply a temporary loss of income.").

The Wells experienced a loss of income in 2005 as a result of the Debtor's wife being laid off from her full-time job and the Debtor's subsequent injury. However, the Debtor is now back at work on a full-time basis. He is apparently in relatively good health. He does not have a college education but has continued with steady employment at Anchor Glass for the past 10-12 years, except for the six months he was out on disability in 2005. He acknowledges that he has not sought alternate employment with either Anchor Glass or other employers in the area. He also testified that given the shifts he works and the problems he has with his legs, he does not believe it is feasible for him to work a second job. According to his testimony, he was not able to request overtime although it did sometimes become available. The Court finds nothing in the facts presented that he will not be able to continue his employment over the next several years. However, without a college education or any other technical training, it is unlikely that his income will increase to any great extent during that period.

On the other hand, the Debtor's wife is currently working part-time both for the post office and a cleaning service. She has not held a full-time position since the end of 2004. She

has a bachelor's degree in elementary education. She testified that except for six months working as a teaching assistant at a pre-school following graduation, she has never obtained a full-time teaching position. According to her testimony, she has applied for teaching positions at various schools in the area and more recently has applied for positions in both Georgia and Tennessee. She is also on a list for a position as clerk at the local post office. While she obviously has had difficulty obtaining a position in her field of study, the Court finds nothing to indicate that she will not be able to obtain a full-time position in the future. She is only 47 years of age and apparently in excellent health with useable job skills. Her inability to find a full-time better-paying job under such circumstances does not warrant a finding that the second prong of *Brunner* has been established by the Debtor. In addition, there was testimony that their son was currently earning $13-$14 per hour as a design specialist and that he would be willing to assist his parents in paying back the loans once he was able to increase his own earnings. These are simply not the type of "exceptional circumstances" that suggest a continuing inability to repay the loans over an extended period of time that would constitute an undue hardship pursuant to Code § 523(a)(8).

Good Faith Efforts to Repay the Loans

Having failed to establish the second prong of *Brunner*, it is unnecessary for the Court to determine whether the Debtor made a good faith effort to repay the loans in the past. However, the Court feels it appropriate to at least comment on the facts presented in an analysis of whether the Debtor made a "good faith" effort to repay the loan.

The Debtor's response Interrogatory No. 13 indicates that he had made payments on the loans between January 2001 and February 2004. At the trial, he testified that he had made

payments of approximately $195 per month during that time. In December 2004, the last month in which his wife was employed full-time and the same month in which he was forced to change shifts, resulting in an annual decrease in his pay of $7,000, he consolidated the loans and financed $51,818.10 pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. 1070 et seq. *See* Debtor's Exhibits 1 and 2. He agreed to make payments of $190.95 per month for 24 months, beginning March 22, 2005.

"'[F]ederal consolidation loans are new agreements which discharge the liabilities of the old loans and create their own obligation.'" *Fabrizio*, 369 B.R. at 244-45, quoting *In re Clarke* 266 B.R. 301, 397 (Bankr. E.D.Pa. 2001) (citing to 20 U.S.C. § 1078-3(e)). The fact that the Debtor may have made payments on the loans before consolidating them provides an inference that he took his loan obligations seriously. *Fabrizio*, 369 B.R. at 245. However, focusing on the period after consolidation, he was to have begun making payments in March 2005. However, that was the same month in which he injured his back and was out on disability for six months while his wife was working part-time for the post office. According to the Debtor, he obtained a deferment on the consolidated loan of a year. Nonetheless, he acknowledged that he had not commenced making payments in March 2006 either. The fact that the Debtor made no payments on the consolidated loans whatsoever outweighs any positive inference from his earlier payments made prior to consolidating the loans. *Id.* In addition, the Court takes note of the fact that a month after he returned to work in September 2005 he filed his chapter 7 petition and received a discharge on February 10, 2006, discharging approximately another $17,000 in unsecured

debt.[11]

The Debtor and his wife enjoy what could be construed as a modest lifestyle. They sporadically go out to dinner, spending no more than $30 a month. The Debtor also enjoys an occasional game of golf in the summer. They own their own home. They reaffirmed their obligation on the home mortgage of $556.78 per month, which originally arose in December 1999. At the time he filed his Petition in October 2005, the consolidated loan was still in forbearance, if the Debtor's testimony is to be believed. Given the facts as presented by the Debtor, it is difficult for the Court to find a lack of good faith on the part of the Debtor. The Court also recognizes that this is not the typical situation in which a student upon graduation simply ignores his obligations to repay his/her student loans. The Debtor has had a run of bad luck since incurring the debt, and while the Court is precluded from equitable concerns in analyzing "undue hardship," it believes that it is appropriate to consider what other avenues may be available to the Debtor.

In this regard, the Debtor has requested, in the alternative, that the Court consider a partial discharge of his obligation to ECMC. As this Court has previously noted, not all courts have agreed to consider a partial discharge of a student loan obligation. *See In re Kenny*, 313 B.R. 100, 108 (Bankr. N.D.N.Y. 2004) (citations omitted); *see also In re Reed*, Case No. 04-10570, 2005 WL 1398479 at *1 (Bankr. D.Vt. 2005). The court in *Reed* acknowledged that other courts have found authority pursuant to Code § 105(a) to allow a partial discharge of student loans "provided

---

[11] The Court takes notice that this was similar to that which occurred in December 2004 when the Debtor's wife lost her full-time job and found it necessary to file her own chapter 7 petition. In that case, she was able to discharge approximately $31,000 in unsecured debt, exclusive of her own student loans of $38,785.41.

18

that the debtor is able to establish undue hardship as to that portion of the debt sought to be discharged." *Id.*, citing *inter alia Kenny*, 313 B.R. at 108 and *Muto v. Sallie Mae, et al. (In re Muto)*, 216 B.R. 325, 331 (Bankr. N.D.N.Y. 1996).

In *Kenny* the debtor was 41 years old, married with three children living at home, along with her spouse. The debtor, who was earning $44,000 per year as a litigation examiner for an insurance company, was the sole support for the family of five as both her husband and one son were students. *Kenny*, 313 B.R. at 105. The balance on her student loans totaled $58,730.77, and it was expected that upon graduation her husband would also have student loans to repay. *Id.* at 107. This Court declined to grant the debtor a partial discharge but deemed it appropriate to allow her a deferment for a period of one year, without additional accrual of interest, during which she would have the opportunity to pursue alternative forms of repayment. *Id.* at 109. The Court presumed that in a year's time her husband would be contributing to the family's income. *Id.*

With respect to the matter presently under consideration, the Court believes that similar relief is warranted. The Court concludes that it is appropriate to allow the Debtor a year's deferment, without further accumulation of interest for that year, before he has to begin making payments on the student loan obligation. Hopefully, this will allow the Debtor's spouse to obtain additional or alternative employment, thereby increasing their income combined to allow for such payments.

Based on the foregoing, it is hereby

ORDERED that the Debtor's obligation to ECMC is nondischargeable pursuant to Code § 523(a)(8); and it is further

19

ORDERED that the Debtor commence making payments to ECMC a year from the date of this Order based on a schedule of payments available under the William D. Ford Direct Loan repayment program consistent with the findings herein, including the fact that additional interest not accrue during that year.

Dated at Utica, New York

this 18th day of October 2007

/s/   Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge